UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YASMINE MAHONE and BRANDON TOLE, | CASE NO. C22-594 MJP |
| Plaintiffs, | ORDER ON MOTION FOR CLASS CERTIFICATION AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION |
| v. | |
| AMAZON.COM, INC., et al., | |
| Defendants. | |

This matter comes before the Court on Plaintiffs' Motion for Class Certification (Dkt. No. 70) and Defendants' Motion for Leave to File Supplemental Declaration (Dkt. No. 117). Having reviewed the Motions, Plaintiffs' Supplemental Brief in Support of the Motion for Class Certification (Dkt. No. 80), the Responses (Dkt. Nos. 88, 118), the Reply (Dkt. No. 107), and all supporting materials, the Court DENIES the Motion for Class Certification and DENIES as MOOT the Motion for Leave.

**BACKGROUND**

Plaintiffs Yasmine Mahone and Brandon Tole allege that Amazon mistreated them on account of their military service in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). Mahone believes that Amazon's decision to terminate her and refuse reemployment violated USERRA, while Tole believes he was not properly promoted and compensated upon his return from an extended military leave of absence. In addition to their individual USERRA claims, Mahone and Tole seek to represent a class of similarly-situated Amazon employees. Specifically, Mahone argues that Amazon violated USERRA by terminating her and other similarly-situated employees pursuant to a company-wide policy that required prior, written notice before being able to take military leave. Tole argues that Amazon violated USERRA by failing to reinstate him and other similarly-situated employees at the same level of seniority and promotion had they not taken military leave. Plaintiffs seek to certify one class and three subclasses of similarly-situated individuals.

To unpack Plaintiffs' Motion for Class Certification, the Court reviews USERRA's statutory and regulatory rules, each Plaintiff's individual allegations, Amazon's relevant policies and procedures, classwide data, and the proposed class and subclasses.

**A.     Legal Standards under USERRA**

USERRA was enacted in 1994 "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." 38 U.S.C. § 4301(a)(1). "USERRA protects the job security of returning veterans." Hanson v. Cty. of Kitsap, 21 F. Supp. 3d 1124, 1136 (W.D. Wash. 2014) (quoting Petty v. Metro. Gov't of Nashville & Davidson Cty., 687 F.3d 710, 716 (6th Cir. 2012) (internal citations omitted)). "Through USERRA, Congress endeavored to 'clarify, simplify, and,

where necessary, strengthen the existing veterans' employment and reemployment rights

provisions.'" Belaustegui v. Int'l Longshore & Warehouse Union, 36 F.4th 919, 923 (9th Cir.

2022) (quoting Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002) (quotations

omitted)). "As a law advancing the interests of veterans, USERRA is 'liberally construed for the

benefit of those who left private life to serve their country in its hour of great need.'" Id. (quoting

Ziober v. BLB Res., Inc., 839 F.3d 814, 819 (9th Cir. 2016) (quotation omitted)).

"Several provisions of USERRA coordinate to provide this security: Sections 4312 and

4313, the 'reemployment provisions,' entitle veterans to reemployment after military service and

prescribe the positions to which they are entitled upon returning." Petty, 687 F.3d at 716 (internal

citations omitted). Section "4316 guarantees veterans the same benefits they would have enjoyed

absent the interruption in their employment and prevents employers from terminating without

'cause' any returning veteran within one year of his reemployment." Id. The "discrimination

provision," § 4311, "prohibits employers from discriminating against veterans on the basis of

their military service." Id. And Section 4318 governs pension plan benefits for returning

veterans. 38 U.S.C. § 4318.

USERRA regulations specify that the employee "must notify the employer that the

employee intends to leave the employment position to perform service in the uniformed

services." 20 C.F.R. § 1002.85(a). But the employee may give either verbal or written notice, and

their notice "does not need to follow any particular format." 20 C.F.R. § 1002.85(c). Regulations

clarify that although there is no deadline by which to give prior notice, the "employee should

provide notice as far in advance as is reasonable under the circumstances." 20 C.F.R. §

1002.85(d). And Defense Department regulations "strongly recommend[] that advance notice to

civilian employers be provided at least 30 days prior to departure for uniformed service when it

1   is feasible to do so." <u>Id.</u> But, importantly, an employee need not provide documentation prior to

2   performing periods of military service obligations in order to take military leave. Documentation

3   is required only when requesting reemployment after periods of service of more than thirty days.

4   20 C.F.R. §§ 1002.121, -.122, -.123.

5   **B.    Yasmine Mahone**

6           Mahone, who is a Private in the Alabama Army National Guard, began working for

7   Amazon on July 16, 2020 in Bessemer, Alabama. (Declaration of Yasmine Mahone ¶¶ 6-7 (Dkt.

8   No. 72).) While she was employed by Amazon, she "performed various periods of military

9   service obligations that required me to take military leave." (<u>Id.</u> ¶ 8.) She states that she used a

10  mobile phone application to request time off and to notify Amazon of her military service

11  obligations. (<u>Id.</u> ¶ 11.) She states that prior to a three-day "drill weekend" in October 2020, she

12  "timely notified Amazon of [her] impending military service obligations and took military leave

13  without pay ('LWOP') from Thursday, October 15 through Sunday, October 18." (<u>Id.</u> ¶ 13.)

14  "Amazon approved this request on September 29, 2020." (<u>Id.</u>) Notwithstanding the time-off

15  approval, Amazon informed Mahone on October 18, 2022 that she was terminated because she

16  had a negative unpaid time-off (UTP) balance as a result of the hours she missed during the "drill

17  weekend." (<u>Id.</u> ¶ 14.) On October 22, 2020, a case manager from the Amazon Disability and

18  Leave Services (DLS) team emailed Mahone asking "to confirm if [Mahone] believe[d] this had

19  anything to do with un-reported Military leave dates." (<u>Id.</u> ¶ 15.) The case manager told Mahone

20  to contact the HR Military Team if she believe she had been "incorrectly terminated." (<u>Id.</u>) And

21  she was told she would "be required to provide military documentation to support any unreported

22  dates." (<u>Id.</u>) Mahone then provided proof of her military drill schedule, and the DLS case

23  manager told her that her request for reinstatement would be "escalated" to a "specialist for

24

1  review." (Id. ¶¶ 16-17.) Roughly two weeks later the DLS case manager emailed Mahone,

2  stating:

3      [O]ur escalations department evaluated your termination case and informed us that since
       documentation was not provided timely, the leave time was not coded causing the
4      negative UPT hours. At this moment, the DLS team will not proceed with the
       reinstatement request.

5  (Id. ¶ 18.)

6      After Mahone filed suit in September 2022, Amazon advised Mahone's counsel that she

7  had been terminated due to "successive technical and human errors." (Second Amended

8  Complaint ¶ 41 (Dkt. No. 44).) Amazon's outside counsel states that after Mahone filed suit,

9  "Amazon investigated her claim" and "acknowledged that Ms. Mahone had been mistakenly

10 terminated due to an administrative error and apologized for the error." (Declaration of Lauren

11 M. Blas ¶ 5 (Dkt. No. 29).) Amazon then "unconditionally offered Ms. Mahone reinstatement on

12 June 30, 2022" and paid Mahone $47,880. (Id. ¶ 6.) This sum included "all of the wages that Ms.

13 Mahone would have earned between October 18, 2020 [and] . . . December 2, 2021—the date

14 she began working for a new employer" and, as "a goodwill gesture, . . . all of the wages that Ms.

15 Mahone would have earned between the date she started her new employment and June 30,

16 2022—the date Amazon offered her unconditional reinstatement, with no offset of earnings from

17 Ms. Mahone's new employment." (Id.)

18     Mahone alleges Amazon willfully violated USERRA by discriminating against her on

19 because her military service. Under USERRA, a military service member "shall not be denied

20 . . . reemployment, retention in employment, . . . by an employer on the basis of that [military]

21 membership" or in the "performance of [a military] service, or obligation." 38 U.S.C. § 4311(a).

22 An employer violates USERRA "if the person's membership,  . . . service, . . . or obligation for

23 service in the uniformed services is a motivating factor in the employer's action, unless the

24

ORDER ON MOTION FOR CLASS CERTIFICATION AND MOTION FOR LEAVE TO FILE
SUPPLEMENTAL DECLARATION - 5

1  employer can prove that the action would have been taken in the absence of such membership,

2  . . . service, . . . or obligation for service[.]" 38 U.S.C. § 4311(c)(1).

3        The Court notes, additionally, that in ruling on Amazon's Motion to Dismiss the

4  Amended Complaint, the Court found that Mahone lacks standing to pursue claims for front pay

5  because she accepted all wages that were due. (Order on MTD Am. Compl. at 4-5, 8-9 (Dkt. No.

6  34).) The Court also found that Mahone could not pursue a claim for reemployment because she

7  did not timely ask for reemployment, as required of 38 U.S.C. 4312(a)(3). (<u>Id.</u> at 11.) But in

8  ruling on the Motion to Dismiss the Second Amended Complaint, the Court found that Mahone

9  could pursue claims for liquidated damages if she could show that Amazon willfully violated

10  USERRA. Amazon may be required to pay liquidated damages of twice the wages due if

11  Amazon's "failure to comply with the provisions of [USERRA] was willful." 38 U.S.C. §

12  4323(d)(1)(C).

13  **C.  Brandon Tole**

14        Tole, who is a commissioned officer in the U.S. Marine Corps Forces Reserve began his

15  employment with Amazon in 2017 "as an Outbound Area Manager," at a level of L5.

16  (Declaration of Brandon Tole ¶¶ 6-8 (Dkt. No. 73).) Tole was part of Amazon's Military Leaders

17  Program (now called "Amazon Pathways"), which "was an executive management program

18  wherein members would gain experience in as an Area Manager (L5), Operations Manager (L6),

19  Senior Operations Manager (L7), and then 'graduate' the Program to the position of General

20  Manager (L8)." (<u>Id.</u> ¶ 8.) In December 2017, he was promoted to Operations Manager (L6) and

21  remained in that position at the time he took military leave in May 2019. (<u>Id.</u> ¶¶ 9, 16.) In

22  January 2019, Tole provided written notice that he had accepted military deployment that was to

23  last from May 2019 to the fall of 2021. (<u>Id.</u> ¶ 10.) Tole states that he received positive

24

performance reviews in the first quarter 2019 and that he believed he was eligible for promotion to L7 in the spring of 2019. (Id. ¶ 12.) But after he provided notice of his military service, he alleges that he "was pulled from consideration for L7 by his supervisor." (Id.) Tole avers that other individuals who were part of the Amazon Pathways program who started around the same time he did, but did not take military leave, were promoted. (Id. ¶¶ 13-15, 35-37.)

After Tole requested military leave, but before he took leave, he was given a negative "overall value" (OV) rating of "least effective" (LE) and put on a "focus plan," though he was not notified of the reasons negative rating or focus plan. (Tole Decl. ¶¶ 17-18.) While on leave, he received no bonus or increase in compensation. (Id. ¶ 20.) Tole returned to work for Amazon in November 2021 and was assigned the position of Inbound Operations Manager (L6) and scheduled for a night shift. (Id. ¶ 25.) Tole's supervisor informed him in January 2022, that he was starting with a "clean slate," and that none of the progress he made before taking military leave could towards his L7 promotion. (Id. ¶ 26.) Tole was also told in January 2022 that he had received a negative rating while on leave, but that he would not receive the basis for this rating. (Id. ¶ 27.) At this same meeting, a manager told Tole that he was "'too new to rate'" and that he would be given an introductory OV rating of "highly valued 1 (HV1) that negatively impacted his bonus and eligibility for promotion. (Id. ¶ 28.) Tole was told that he was next eligible for promotion in August 2022. (Id. ¶ 29.) Tole alleges that in the spring 2022, his supervisor told him that he might be removed from the Pathways program for not being promoted to L7 within thirty-six months given that his pre-leave work did not count towards his promotion. (Id. ¶ 31.) Tole has not been given an opportunity to interview for a promotion and remains the longest tenured L6 at his location—twenty-eight months at the same pay grade. (Id. ¶ 33.)

**D.      Policies and Procedures**

Plaintiffs have identified what they believe are company-wide policies and procedures that touch on: (1) how hourly employees are treated when requesting unpaid time off for military leave; and (2) the how compensation and promotions are determined for salaried individuals who take military leave. The Court reviews these policies and practices.

**1.      Unpaid Time Off (UPT) and Leave Requests**

There are several policies and procedures that Plaintiffs have identified concerning UPT and military leave.

First, Amazon has had a Military Leave of Absence Policy in place since 2017 that requires prior notice of a military leave of absence (LOA) "when feasible." (See Exhibits 2-5 to the Declaration of Brian J. Lawler (Dkt. No. 76-2—76-5)[1].) The policy states that "[a]n employee should contact DLS to request Military LOA" and that "[w]henever possible, Military LOA should be requested 30 days prior to the start of leave." (See Lawler Decl. Ex. 4.) It also states that "[n]otice of all non-emergency and planned Military LOAs must be requested prior to the start of leave, when feasible." (Id.) The Policy does not require documentation. "[D]ocumentation is only required for Military LOA that exceeds a specified duration and upon the employee's request for reinstatement (return to work)." (Id.) But "Amazon may request that the employee submit Military Orders (or other documentation) at the time the Military LOA is requested in order to assist with administering the LOA." (Id.)

Second, the Standard Operating Procedures for Military Leaves (Military Leaves SOP) reinforces the Policy's admonition that documentation is not required to take military leave.

---

[1] The only relevant changes to this Policy appear to be a pre-December 2019 requirement that employees had to notify "MyAmbassador-Military" rather than DLS. (See Lawler Decl. Ex. 4 (Dkt. No. 76-4).)

1  (Exhibit 15 to the Declaration of Brian Richman (Dkt. No. 97-15).) The Military Leaves SOP,

2  dated January 2019, expressly states that "[t]here is **NO** written documentation required to apply

3  for military leaves that fall under USERRA" and that "[w]e don't require any actual

4  documentation for initial leave and we don't pursue documentation because according to

5  USERRA, we are not allowed to do so." (Id. at 4 (emphasis in original).)

6       Third, Plaintiffs identify Amazon's USERRA Military Case Management SOP [standard

7  operating procedures]" as a source of company-wide procedures. (Lawler Decl. Ex. 7 (Dkt. No.

8  76-7.) This SOP, developed in 2022, does not require the employee to provide written notice

9  before taking a military leave of absence.

10       Fourth, Plaintiffs identify Amazon's "Policy: Attendance Unpaid Time (UPT)," which

11  states that "Amazon does not deduct UPT when absences are covered by paid time off, one of

12  our leave of absence (LOA) policies, Accommodations Policy, or applicable law." (Lawler Decl.

13  Ex. 8 at 2 (Dkt. No. 76-8).)

14       Fifth, Plaintiffs a document entitled "NACF NUPT Term Transition Pilot" that provides

15  standard operating procedures "regarding the Negative UPT process" for "hourly Core

16  Associates for NACF." (Exhibits 6 & 7 to the Supplemental Declaration of Gary Stonebarger

17  (Dkt. Nos. 83-6, 86-7) (these appear to be duplicates).) The Court refers to this as the Negative

18  UPT SOPs. Plaintiffs rely on a portion of the SOPs which state that "[a]ssociates with an open

19  Intermittent Military LOA often are attending military drills or boot camp" and "[t]he associate

20  has to submit a drill letter/military orders to their DLS Case Manager to have the time coded."

21  (Id. at 5.) The Negative UPT SOPs are undated, and Plaintiffs have provided little to explain how

22  these SOPs are used and applied. The sole deposition testimony Plaintiffs present on the

23  Negative UPT SOPs—from Brianna Morrell—does not provide any answers. Counsel only

24

asked Morrell whether the Negative UPT SOPs' documentation requirement was "the same

substantively at all times since [Morrell has] been there." (Supp. Stonebarger Decl. Ex. 5 at 7.)

Morrell confirmed that she did not recall the policy changing. (Id.) And although Plaintiffs failed

to be specific with their questioning, it appears that Morrell has been with Amazon since at least

2019. (See Morrell Dep. at 43 (Lawler Decl. Ex. 10 (Dkt. No. 76-10).) More importantly,

Plaintiffs fail to provide any testimony from Morrell or anyone else about how the Negative UPT

SOPs were applied and how these procedures' document requirement might interact with the

Military LOA Policy or the Military Leave SOPs, which do not require documentation to request

time off.

### 2.      Reinstatement After Return from Leave

Amazon's Military LOA Policy states that: "Upon completion of Military LOA, Amazon

will make reasonable efforts to reinstate a qualified employee to the position he/she would have

had held had his/her employment not been interrupted by military service." (Lawler Decl. Ex. 2

at 4; id. Ex. 3 at 4; id. Ex. 4 at 4; id. Ex. 5 at 6.) This requirement appears consistent with

USERRA, and Plaintiffs do not argue otherwise. Amazon's Rule 30(b)(6) witness also confirmed

that "USERRA mandates that a service member, upon reemployment, should be entitled to the

same seniority rights and benefits as if they had never left employment. (Deposition of Anne

Hughes at 32 (Lawler Decl. Ex. 9 (Dkt. No. 76-9 at 4)).)

As to employee reviews and compensation adjustments, the Military LOA Policy states

that "[a]ll employees eligible for OV and who have worked for at least two of the last 12 months

should receive an OV, [and] any exceptions will be addressed on a case-by-case basis." (Lawler

Decl. Ex. 2 at 3; id. Ex. 3 at 3; Id. Ex. 4 at 3; Id. Ex. 5 at 4.) The Policy explains further that

"[a]n employee who has worked less than two months is not eligible for a compensation

1    adjustment unless applicable law requires otherwise" and "[a]n employee LOA status does not

2    impact the effective date of compensations adjustments, if any." (Id.) Amazon's Rule 30(b)(6)

3    witness confirmed that an "OV rating typically covers a year, and you review the work during

4    that year." (Deposition of Anne Hughes at 134 (Ex. 4 to the Supp. Stonebarger Decl. (Dkt. No.

5    83-4)).) She also confirmed that "a personnel record remains intact, after an employee goes on

6    leave and returns." (Id.)

7         Plaintiffs have identified that the OV rating system is intended to result in a distribution

8    curve across each work site. (Deposition of Brian Dwyer at 27-28 (Lawler Decl. Ex. 11 (Dkt.

9    No. 76-11).) However, the Pathways program to which Tole belongs does not have a similar

10   "calibration" for OV ratings. (Id.) And not every employee may ever obtain an OV rating.

11   (Declaration of Brian Dwyer ¶ 10 (Dkt. No. 92).) There are "nearly 50 job codes, including Ms.

12   Mahone's job code" that are ineligible for an OV rating. (Id. ¶ 10(c)).)

13   **E.    Classwide Data**

14        Plaintiffs' Motion relies heavily on data summations created to Plaintiffs' counsel, Gary

15   Stonebarger, which Plaintiffs claim show discriminatory treatment of the proposed class and

16   subclasses. Amazon disputes the accuracy of counsel's summations and was given leave to

17   depose Stonebarger about the methodology he used to prepare the summations. The Court

18   reviews the data source, counsel's summations, and Amazon's criticisms of the summations.

19        **1.    The Spreadsheet**

20        Through discovery, Amazon produced a spreadsheet showing all military leave taken by

21   employees from June 6, 2018 through July 24, 2023. (Supp. Stonebarger Decl. ¶¶ 4, 7.) The

22   spreadsheet contains 32 columns of data, including a unique employee ID and various job level

23   data, including, but not limited to, OV ratings, job level, and a termination date for each

24

employee (if applicable). (<u>See</u> Expert Report of Valentin Estevez ¶ 8 (Dkt. No. 102).) According to Plaintiffs' counsel and Amazon's expert, there are over 121,000 rows of data (where each row identifies a military leave period), and 14,842 unique employee identification numbers in the spreadsheet. (Supp. Stonebarger Decl. ¶ 4 (identifying 121,843 leave periods and 14,842 unique employees); Expert Report of Valentin Estevez ¶ 6 (Dkt. No. 102) (identifying 121,482 rows of data and 14,842 employees).)

### 2.    Counsel's Summations

Gary Stonebarger, counsel for Plaintiffs, provided a supplemental declaration that contains what he labels as "summation[s] of numbers reflected in the spreadsheet" that he claims are admissible under Federal Rule of Evidence 1006. (Supp. Stonebarger Decl. ¶ 3.) He avers that by applying "Microsoft Excel's sorting and filtering functionality contained in the spreadsheet," he determined that of the 14,842 employees identified, 13,668 were hourly employees and 1,081 were salaried, while 94 were unidentified as hourly or salaried. (<u>Id.</u> ¶ 4.) He then claims that "of the 14,842 Military Employees who took MLOA [military leave of absence] during this 5-year period, 10,756 have had termination of employment with Amazon following their MLOA periods." (<u>Id.</u>) And he claims that "of the 8,800 Hourly Military Employees who took intermittent MLOA, 7,023 had their employment terminated following their intermittent MLOA." (<u>Id.</u>)

Counsel also applied the same "sorting and filtering functionality" to determine that "there was no Job Level listed for 10,794 of the 14,842 Military Employees" in the spreadsheet and "14,058 Military Employees (who took 112,377 periods of MLOA) received no OV Rating from Amazon at any time during their employment following their return from MLOA." (Supp. Stonebarger Decl. ¶ 7.) Based on this summation, Plaintiffs argue that 95% of the employees

1   who took military leave never received an OV rating after returning from a military LOA and

2   that over 70% of the employees were terminated after taking leave. (Supp. Mot. at 2, 7.) This,

3   Plaintiffs argue, shows that Amazon systematically violated USERRA by failing to reinstate

4   employees at the level they would have been if they had not taken leave and for terminating them

5   after taking MLOA.

6       Amazon has deposed Stonebarger to understand precisely how he "sorted" and "filtered"

7   the data using Microsoft Excel. (Deposition of Gary Stonebarger (Dkt. No. 115).) Amazon's

8   counsel focused on how Stonebarger created the summations relating to OV ratings, job level

9   information, and terminations after military leave. (See id.) Stonebarger confirmed that his use of

10  the filtering and sorting features removed substantial rows of data—roughly 88% of the data

11  rows were removed in preparing the summaries. (Id. at 16, 18-20, 23, 88-89, 101-02.) While

12  Stonebarger did not agree his summations "deleted" data, there appears no dispute that his

13  filtering and de-duplication process removed a substantial number of rows of data. Additionally,

14  Stonebarger did not undertake any effort to determine whether his summations were accurate or

15  omitted relevant information. (Id. at 112-13.) And in several instances, Stonebarger confirmed

16  his summations had excluded contradictory or additional relevant information about certain

17  employees included in his summation data. (Id. at 28-30, 91-95.)

18          **3.      Criticism of the Summations**

19      Amazon presents several attacks to the reliability of counsel's summations. First,

20  Amazon's expert, Valentin Estevez, notes that Stonebarger's effort to "filter" the data has led to

21  the arbitrary exclusion of 106,640 rows of data, or 88% of the rows of data. (Estevez Report ¶

22  6(a), 13.) Estevez explains that Stonebarger arbitrarily excluded military leave information

23  because the spreadsheet's rows were not listed in any particular order and Stonebarger's de-

24

duplication process saved only the first row of data identified for each unique employee

identifier, and discarded the other rows. (Id. ¶¶ 14-16.) This led to a haphazard exclusion of

records that are unaccounted for and not reflected in the summations. (Id. ¶¶ 15-16.) Second,

Estevez calls Stonebarger's claim that 80% of hourly employees had their employment

terminated after taking leave is "meaningless and misleading" because the data does not

distinguish between voluntary and involuntary termination. (Id. ¶ 6(c).) Third, Estevez labels

Stonebarger's OV-rating statistics "invalid because Mr. Stonebarger does not account for

Amazon's policies regarding OV rating eligibility," where not every employee can be eligible for

an OV rating. (Id. ¶ 6(d)). Fourth, Estevez asserts that Stonebarger's conclusions about the lack

of job level data is inaccurate, and that he found 98% of employees had job level data. (Id. ¶¶ 17-

18.)

   After taking Stonebarger's deposition, Amazon has filed a Motion for Leave to present

the Court with Estevez's supplemental report, which explains how Stonebarger's filtering and

sorting arbitrarily excluded information. (Supplemental Estevez Report (Dkt. No. 117-1).)

Plaintiffs ask the Court not to consider the report, or to at least allow them to depose Estevez if

leave to file it is granted.

**F.**   **Class and Subclasses**

   In their initial Motion, Plaintiffs asked the Court to certify one class and two subclasses

from June 2017 to the present:

> **Military Employee Class**: All current and former employees of Amazon who were or
> are currently serving in the United States Armed Services or National Guard.
>
> **Hourly Military Employee Subclass**: All current and former hourly employees of
> Amazon who were or are currently serving in the United States Armed Services or
> National Guard.

**Salaried Military Employee Subclass**: All current and former salaried employees of Amazon who were or are currently serving in the United States Armed Services or National Guard.

(Mot. at 15.) In their supplemental Motion, Plaintiffs have added a new subclass:

**Intermittent MLOA Hourly Military Employee Subclass**: All current and former hourly employees of Amazon who were or are currently serving in the United States Armed Services or National Guard, and who took Intermittent MLOA while employed by Amazon.

(Supp. Mot. at 8.)

Amazon takes issue with the proposed subclasses, noting that the Second Amended Complaint only identifies a "nationwide class" of "Amazon employees who are or were members of the United States Armed Services Reserves or National Guard and who took or have taken military leave while being employed by Amazon." (SAC ¶ 83.)

## ANALYSIS

### A.    Class Certification Standard

Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine whether to certify a class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). The plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. See Leyva v. Medline Indus., 716 F.3d 510, 512 (9th Cir. 2013); Fed. R. Civ. P. 23(a). The plaintiff must also satisfy one of the Rule 23(b) factors. Here Plaintiffs seek certification under the "predominance" standard of Rule 23(b)(3). "To obtain certification of a class action for money damages under Rule 23(b)(3)," a putative class must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460.

Plaintiffs must demonstrate the prerequisites of Rule 23 by a preponderance of the evidence. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). "In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." Id. "In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." Id. (citing Wal-Mart, 564 U.S. at 349–50). And "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).

"In making the determinations necessary to find that the prerequisites of Rule 23(b)(3) are satisfied, the district court must proceed just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." Olean, 31 F.4th at 666 (citation and quotation omitted). The "court must make a rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the common question in one stroke." Id. (citation and quotation omitted). "In addition, the court must find that this common question (i.e., the 'common, aggregation-enabling' issue) predominates over individual issues." Id. (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016)).

Below, the Court reviews the Rule 23(a) and 23(b)(3) requirements in the context of this case and as applied to the proposed class and subclasses.

**B.    Rule 23(a)(1): Numerosity**

Numerosity exists when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the

specific facts of each case and imposes no absolute limitations." <u>Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n</u>, 446 U.S. 318, 330 (1980). Here, there is no serious challenge to numerosity of the class and subclasses. There are over 14,000 people identified in the proposed class, and over a thousand individuals in each subclass. Plaintiffs have satisfied their burden as to numerosity.

**C.      Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance**

The Parties dispute both commonality and predominance, which the Court considers together given their overlapping nature. <u>See, e.g.</u>, <u>Valentino v. Carter–Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."). After reviewing the requirements of Rule 23(a)(2) and Rule 23(b)(3), the Court notes a substantial lack of evidence of commonality and predominance as to the proposed class and subclasses, which defeats Plaintiffs' request for class certification. The Court analyzes these issues as to Mahone's and Tole's claims independently, given the divergent nature of the claims.

**1.      Rule Requirements**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." <u>Wal-Mart</u>, 564 U.S. at 349–50 (citation and quotation omitted). To satisfy commonality, the claims must depend on a common contention "that is capable of classwide resolution." <u>Id.</u> at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." <u>Id.</u> (quotation and citation

1    omitted). "Dissimilarities within the proposed class are what have the potential to impede the

2    generation of common answers." Id. (quotation and citation omitted).

3        The "predominance inquiry tests whether proposed classes are sufficiently cohesive to

4    warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623

5    (1997). "This calls upon courts to give careful scrutiny to the relation between common and

6    individual questions in a case." Tyson Foods, 577 U.S. at 453. "An individual question is one

7    where members of a proposed class will need to present evidence that varies from member to

8    member, while a common question is one where the same evidence will suffice for each member

9    to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Id.

10   (citation and quotation omitted). "The Rule 23(b)(3) predominance inquiry asks the court to

11   make a global determination of whether common questions prevail over individualized ones."

12   Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1134 (9th Cir. 2016). "Considering whether

13   questions of law or fact common to class members predominate begins, of course, with the

14   elements of the underlying cause of action." Erica P., 563 U.S. at 809 (internal quotation marks

15   omitted).

16       **2.    No Commonality or Predominance as to Mahone and her Related Class**

17       Plaintiffs have not identified any class-wide means of proving that Mahone's claimed

18   injury is common to a class of similarly-situated hourly employees and that common questions of

19   law or fact predominate over individualized ones. Plaintiffs argue that Amazon has policies and

20   practices which impermissibly require an hourly employee to submit documentation to obtain a

21   military leave of absence and that this leads to terminations in violation of USERRA. (Supp.

22   Mot. at 5-7.) While it is true that USERRA does not require documentation to request leave,

23

24

ORDER ON MOTION FOR CLASS CERTIFICATION AND MOTION FOR LEAVE TO FILE
SUPPLEMENTAL DECLARATION - 18

1    Plaintiffs have not actually identified a policy or procedure that imposes such a requirement. 20

2    C.F.R. § 1002.85(c); 20 C.F.R. §§ 1002.121, -.122, .123.

3          First, Plaintiffs have not identified an Amazon policy or practice that requires its

4    employees to provide written documentation to obtain military leave. The Military LOA Policy

5    does not require written notice, and only states that prior notice is only required "when feasible."

6    (See Lawler Decl. Exs. 2-5 (Dkt. No. 76-2—76-5).) As such, the Policy complies with

7    USERRA. And consistent with that Policy, Mahone's request to take military leave was

8    approved before she took leave. (Mahone Decl. ¶ 13.) Additionally, Amazon's Military Leaves

9    SOP reinforces the Military LOA Policy's admonition that documentation is not required to take

10   military leave. (Exhibit 15 to the Declaration of Brian Richman (Dkt. No. 97-15).) This

11   procedure guide, dated January 2019, expressly states that "[t]here is **NO** written documentation

12   required to apply for military leaves that fall under USERRA" and that "[w]e don't require any

13   actual documentation for initial leave and we don't pursue documentation because according to

14   USERRA, we are not allowed to do so." (Id. at 4 (emphasis in original).) Together, the Military

15   LOA Policy and Military Leaves SOP undermine Plaintiffs' theory that there is a class-wide

16   policy or procedure violating USERRA by requiring documentation to obtain leave.

17          Notwithstanding these policies and procedures, Plaintiffs contend that Amazon's

18   Negative UPT SOPs improperly require all hourly employees to provide documentation in order

19   to take military leave. Plaintiffs identify the Negative UPT SOPs statement that "[t]he associate

20   has to submit a drill letter/military orders to their DLS Case Manager to have the time coded."

21   (Supp. Stonebarger Decl. Exs. 6 at 5.) But there are several flaws in Plaintiffs' reliance on this

22   statement to show a common practice that violates USERRA. First, the Negative UPT SOPs on

23   their face identify only those employees with "an open Intermittent Military LOA"—i.e., those

24

employees who have already taken military leave. Because these SOPs only apply employees on intermittent leave who have already taken leave, the SOPs do not violate USERRA's bar on requiring written pre-leave notice. 20 C.F.R. § 1002.85(a), (c). Second, Plaintiffs provide no evidence that the Negative UPT SOPs have been applied in any manner (individually or on a class-wide basis) that would require employees to provide documentation in order to satisfy their pre-leave notification requirements. Indeed, such a requirement would be inconsistent not only with USERRA, but also with the Military LOA Policy and the Military Leaves SOPs. Third, Plaintiffs identified no testimony or other evidence about how the Negative UPT SOPs apply to the proposed class or subclasses, how they might show a violation of USERRA, or even how they interact with the other policies and procedures identified. The Court notes that Mahone was ultimately terminated because "documentation [of her leave request] was not provided timely, [and] the leave time was not coded causing the negative UPT." (Mahone Decl. ¶ 18.) This may track the Negative UPT SOP's requirement for documentation. But it does not show a pre-leave documentation requirement or that any such requirement applied to other employees. Additionally, Mahone was asked for documentation as part of a reemployment process, which is permitted under USERRA. 20 C.F.R. §§ 1002.121, -.122, -.123. Ultimately, Plaintiffs bear the burden of proof—a preponderance—to show common questions of law or fact will predominate over individual issues. Here, the Negative UPT SOPs have not been shown to be a means of proving a "common question in one stroke." Olean, 31 F.4th at 666. As such, the Court finds Plaintiffs fail to satisfy their burden of both commonality and predominance as to Mahone's claims.

The Court also finds that Stonebarger's summation data does not help identify commonality and predominance. First, the Court finds Stonebarger's summations themselves to

be unreliable. Stonebarger's de-duplication process removed over 80% of the data from the spreadsheet and he undertook no steps to verify whether his summations were accurate. Indeed, during Stonebarger's deposition, he confirmed that there were at least some instances showing that his process removed data that contradicted at least some portion of his summations. Additionally, Stonebarger did not demonstrate any particular expertise with Microsoft Excel's sorting and filtering functionality that would convince the Court that his summations are accurate. The Court does not accept that these summations are accurate or admissible under Federal Rule of Evidence 1006. Even if the Court were to accept Stonebarger's summation as accurate, his summations fail to identify the reason why any of the individuals were terminated and whether some common policy or procedure caused the terminations. At most, the summation suggests that after taking leave, some Amazon employees were terminated or left voluntarily. Tellingly, Plaintiffs argue that "it should be inferred" that Amazon's UPT practices led to significant terminations of hourly employees. (Supp. Mot. at 6.) But an inference from a summation is not consistent with the Ninth Circuit's admonition that the "court must make a rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence." Olean, 31 F.4th at 666 (citation and quotation omitted). Here, the Court's rigorous analysis leads it to conclude that there is inadequate evidence of commonality and predominance.

Based on the record presented, the Court finds that Plaintiffs have failed to meet their burden on commonality and predominance as to Mahone's claims. The Court DENIES certification of Mahone's claims as to the proposed class and subclasses.

1      **3.     No Commonality or Predominance as to Tole and Salaried Employees**

2          Plaintiffs argue that there are common issues that predominate over individualized issues

3      as to salaried Amazon employees who took military leave and were not treated in accordance

4      with USERRA's requirement that they be reinstated as if they had not been absent. The Court

5      finds inadequate evidence to support this argument.

6          The first problem for Plaintiffs is that Amazon's policies on reinstatement comply with

7      USERRA. Amazon's Military LOA Policy states that: "Upon completion of Military LOA,

8      Amazon will make reasonable efforts to reinstate a qualified employee to the position he/she

9      would have had held had his/her employment not been interrupted by military service." (Lawler

10     Decl. Ex. 2 at 4; <u>id.</u> Ex. 3 at 4; <u>Id.</u> Ex. 4 at 4; <u>Id.</u> Ex. 5 at 6.) This requirement is consistent with

11     USERRA, and Plaintiffs do not argue otherwise. And Amazon's Rule 30(b)(6) witness

12     confirmed that "USERRA mandates that a service member, upon reemployment, should be

13     entitled to the same seniority rights and benefits as if they had never left employment.

14     (Deposition of Anne Hughes at 32 (Lawler Decl. Ex. 9 (Dkt. No. 76-9 at 4).)

15         The second problem for Plaintiffs is that they have not identified class-wide proof that

16     Amazon uniformly or consistently fails to reinstate individuals after they take leave consistent

17     with USERRA's requirements. At most, Plaintiffs suggests that Amazon had an unwritten policy

18     or practice of not rating employees on leave with a "Overall Value" (OV) rating and that this led

19     to reinstatement at a lower or disadvantaged basis. It is true that Tole himself was told that he

20     would have a "clean slate" upon his return. (Tole Decl. ¶ 26.) But as Amazon points out, he was

21     rated lower <u>before</u> he took leave than <u>after</u> (he was "least effective" before leave, and "high

22     value 1" after he returned). Plaintiffs try to paper over this gap by pointing to counsel's

23     summation of the data concerning absent OV ratings. But as the Court has already explained,

24

1    counsel's summations are unreliable and inadmissible under Fed. R. Evid. 1006. Moreover,

2    counsel's summation does not distinguish between those who were eligible to obtain an OV

3    rating and those that were. This leads to a massive overinclusion of ineligible employees—

4    13,668 of the 14,842 were not eligible for OV ratings—in his summations. (Estevez Report ¶¶

5    41-42.) Second, even as to those employees who might be eligible at some point to obtain OV

6    ratings, only those who worked a certain number of months are eligible for an OV rating.

7    (Lawler Decl. Ex. 2 at 3; id. Ex. 3 at 3; Id. Ex. 4 at 3; Id. Ex. 5 at 4.) Stonebarger's summation

8    and declaration do not account for this policy. Based on the record presented, the Court rejects

9    Plaintiffs' suggestion that there is class-wide evidence of mistreatment in violation of USERRA.

10       The Court is also unconvinced that Amazon's use of a curve in its OV rating system

11    shows a class-wide injury against military employees. It is true that the OV rating system is

12    intended to result is a distribution curve across each work site. (Deposition of Brian Dwyer at 27-

13    28 (Lawler Decl. Ex. 11 (Dkt. No. 76-11).) But the curve is not mandatory, it is site-specific, and

14    the Pathways program to which Tole belongs does not have a similar "calibration" for OV

15    ratings. (Id.) And, more importantly, there is no evidence that Tole or anyone else was given no

16    or a low OV rating because of the existence of the curve and their military leave.

17       Even if Tole had shown some class-wide means of establishing a USERRA violation, the

18    Court finds that his claims remain unsuited for classwide resolution. Amazon may defeat liability

19    by showing that it would have taken the same action as to an individual employee had the

20    employee not taken military leave. See Huhmann v. Fed. Express Corp., 874 F. 3d 1102, 1108

21    (9th Cir. 2017). Resolving that defense presents unique, individualized factual questions unsuited

22    to classwide resolution. And it requires consideration of not just the OV rating, but of many other

23

24

factors and characteristics unique to that individual. This defense therefore proves fatal to predominance and commonality.

The Court finds that Plaintiffs fail to show commonality and predominance as to Tole's claims and it DENIES the Motion to Certify his claims as to both the class and subclasses.

**D.    Typicality**

Even if the Court found commonality and predominance satisfied, it finds a lack of typicality.

First, Mahone's claims are, at best, typical only of a narrow subset of individuals. Mahone claims she is typical of those who were terminated because Amazon impermissibly requires documentation to take military leave. But Mahone's claim would be atypical of such a class because her pre-leave request was approved and without any documentation. Additionally, even where Mahone has typical claims, she is still atypical as to those individuals who might seek front pay and reemployment. That is because she lacks standing to pursue such claims. Rather, her only claims is for liquidated damages caused by Amazon's willful violation of USERRA—a claim that may well be atypical of others who seek front pay and reemployment who do not need to show a willful violation of USERRA. Together, this shows that Mahone is not typical of class and subclasses she seeks to represent.

Second, Tole's claims are atypical of the class and subclass he seeks to represent. Under Tole's theory, Amazon does not give OV ratings to returning military members post-leave, and this harms their ability to be reinstated as if they had not left. But Tole himself was rated lower before he took leave than after he took leave. While Tole argues that he was only given a lower rating because had requested leave, there is no coherent evidence this was common to a larger class. Tole is additionally atypical of other salaried individuals who are not part of the Pathways

1    program, which has different considerations from other salaried employees. Tole is not typical of

2    the class and subclasses he seeks to represent.

3         Plaintiffs' failure to show typicality is an additional reason why the Court DENIES the

4    Motion for Class Certification.

5    **E.    Superiority**

6         "In determining superiority, courts must consider the four factors of Rule 23(b)(3)."

7    Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of

8    reh'g, 273 F.3d 1266 (9th Cir. 2001). The four factors are:

9         (A) the class members' interests in individually controlling the prosecution or defense of
          separate actions;
10        (B) the extent and nature of any litigation concerning the controversy already begun by or
          against class members;
11        (C) the desirability or undesirability of concentrating the litigation of the claims in the
          particular forum; and
12        (D) the likely difficulties in managing a class action.

13   Fed. R. Civ. P. 23(b)(3)(A)-(D).

14        Plaintiffs have failed to demonstrate the superiority of certifying matter this as a class

15   action. First, given the amounts of money at issue for both Tole and Mahone (who each seek

16   substantial sums), each has an interest in controlling the prosecution of their claims. Though the

17   Court lacks specific data about the potential claims of those in the class, if class members

18   similarly possess large-value claims, they may wish to control this litigation and not be bound by

19   any class-wide resolution of their claims without personal participation. Second, at least as to

20   Tole's claims, which require an analysis of what specific compensation and promotion might be

21   due, Amazon possesses fact-intensive defenses that would likely prove difficult to manage on a

22   classwide basis. Plaintiffs have not convinced the Court a class action is a superior vehicle to vet

23

24

their claims. This is an additional reason why the Court DENIES the Motion for Class Certification.

**F.     Adequacy**

Given the Court's determination that commonality, predominance, and superiority are all lacking, the Court does not find it necessary to analyze the question of adequacy.

**G.     Motion for Leave to File Supplemental Declaration**

The Court finds that the record contains sufficient evidence to assess the validity of Stonebarger's summations without the introduction of this additional report. Consideration of the report is unnecessary to the resolution of the Motion for Class Certification and Plaintiffs have not been afforded a chance to respond to the contents of the report. The Court therefore DENIES as MOOT Amazon's Motion for Leave to File the Supplemental Report of Valentine Estevez.

## CONCLUSION

While Mahone and Tole may possess individual claims under USERRA, they have not convinced the Court that this matter should proceed on a class basis. Plaintiffs have failed to provide sufficient evidence to show commonality, predominance, typicality, and superiority. That is fatal to their Motion for Class Certification. The Court therefore DENIES The Motion for Class Certification and DENIES as MOOT Defendants' Motion for Leave.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 29, 2024.

Marsha J. Pechman
United States Senior District Judge